UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ABDULLAH ALKHALIDI,

                Petitioner,

                v.                            CAUSE NO.: 3:17-CV-185-PPS-MGG

WARDEN,

                Respondent.

## OPINION AND ORDER

Abdullah Alkhalidi, by counsel, seeks habeas corpus relief from his conviction following a jury trial in St. Joseph Superior Court for murder, robbery, and theft. Alkhalidi was sentenced to sixty-five years of incarceration. His principal argument is that he received ineffective assistance of counsel during plea negotiations. But because Alkhalidi has failed to establish that the State court rendered an opinion that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, his petition must be denied.

### Factual Background

In reviewing this petition, I must presume the facts set forth by the State courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The evidence against Alkhalidi was overwhelming as demonstrated by the facts as recounted by the Court of Appeals of Indiana. Here's what the evidence showed:

> On May 2, 1999, Claude Purdiman ("Purdiman") and his brother, Terrance Purdiman ("Terrance"), were at the home of their father. Purdiman showed Terrance and his father $3,000 and said that he was going to the Blue Chip Casino in Michigan City, Indiana. Purdiman and Terrance left their father's house at the same time in separate cars. Terrance went to Benton Harbor and Purdiman turned off the highway to

go to the casino. A surveillance tape from the Blue Chip Casino showed Alkhalidi and Purdiman leaving the casino at the same time around 2:37 in the morning on May 3, 1999.

On May 3, 1999, around 12:30 or 1:00 p.m., Purdiman spoke with Kimberly Holmes and Marjorie Scott in South Bend, Indiana. Purdiman said that he was going over to Alkhalidi's house because they were going back to the gambling boat.

On May 4, 1999, a neighbor saw Alkhalidi washing and shampooing the inside of his car and scrubbing the mats of his car. That same day, Alkhalidi went to the Blue Chip Casino and "bought in" for $1,600, which was unusual for him because his typical "buy in" was fifty to one hundred dollars.

After being unable to reach Purdiman, Terrance and Chantae Taylor, Purdiman's girlfriend, filed a report with the Elkhart Police on May 6, 1999. Taylor and Terrance went through some of Purdiman's personal effects at Taylor's house and found a piece of paper with Alkhalidi's phone number on it.

On May 8, 1999, a call was placed from Purdiman's cell phone at 11:01 p.m. to Dawn Schooley, a woman that Alkhalidi had a child with in 1997. That same day, the Berrien County Sheriff's Department in Michigan received a call that a body was found in the woods. The body was partially burned. The police identified the body as Purdiman. Purdiman died due to a gunshot wound to the head, which was caused by a .44 caliber or .45 caliber bullet. Purdiman's vehicle was discovered in Michigan, and it did not have a license plate.

The police spoke to a casino employee who identified the man on the video as Alkhalidi, and the police obtained Alkhalidi's address from his gaming card. The Berrien County Sheriff's Department contacted the Indiana authorities after obtaining Alkhalidi's name.

On May 13, 1999, Detective Dave Roseneau of the Berrien County Sheriff's Department and members of the State Police observed Alkhalidi's residence in South Bend, Indiana. Alkhalidi drove up to his residence and exited his vehicle. While detectives spoke with Alkhalidi, Detective Roseneau saw Purdiman's license plate sitting in the trunk of Alkhalidi's vehicle, which was open and did not have a trunk liner.

The detectives asked Alkhalidi about the license plate. Alkhalidi became "very, very nervous" and then became "very argumentative." The detectives asked to see Alkhalidi's driver's license. Alkhalidi bent into his vehicle and got a planner out and "was acting like he was going to show" the officers his driver's license. Alkhalidi then began patting around on the seat until Detective Roseneau said, "That's enough. Get out of there." Alkhalidi attempted to grab the license plate out of the car. Alkhalidi came out of the car, shoved Detective Roseneau to the ground, and ran. The detectives chased after Alkhalidi until a bystander tackled Alkhalidi. After obtaining a search warrant for Alkhalidi's house and vehicle, the police discovered the trunk liner in a trash can. The police recovered a bottle of ammonia and Purdiman's license plate from the trunk of Alkhalidi's vehicle. The police also discovered a Ruger nine-millimeter handgun, a .45 caliber cartridge, a .45 caliber spent case, a bullet, and Purdiman's driver's license in Alkhalidi's vehicle. The police discovered ammonia, wash cloths or towels, a shirt, an empty "Blue Chip matchbook," and a partially burnt piece of paper that had the word "Blue" on it in a trash can. The police also discovered an item from the Blue Chip Casino with Purdiman's name on it. Purdiman's blood was detected on the floor mat, the towel, the paper towels, a t-shirt, the trunk mat, and the floor carpeting from the passenger seat. Alkhalidi's fingerprint was discovered on the cartridge holder.

After a jury trial in 2000, Alkhalidi was convicted of murder, robbery, and theft. The trial court sentenced Alkhalidi to a total sentence of sixty-five years.

* * *

In 2002, Alkhalidi filed a petition for post-conviction relief. The trial court granted Alkhalidi's petition for post-conviction relief and ordered a new trial.

* * *

The jury found Alkhalidi guilty as charged [at the second trial in 2008]. The trial court merged Count I, murder, and Count III, felony murder. The trial court convicted Alkhalidi of Count I, murder, Count II, theft as a class D felony, and Count IV, robbery as a class B felony. The trial court sentenced Alkhalidi to fifty-five years for murder, ten years for robbery as a class B felony, and eighteen months for theft as a class D felony. The trial court ordered that the sentences for murder and robbery be served consecutively. The trial court ordered that the sentence for theft run

concurrently with the sentence for robbery. Thus, Alkhalidi received an aggregate sentence of sixty-five years in the Indiana Department of Correction.

ECF 12-5 at 2-10; *Alkhalidi v. State*, 912 N.E.2d 448 (Ind. Ct. App. 2009).

Alkhalidi argues that he is entitled to habeas corpus relief because of three instances of ineffective assistance of counsel: (1) failing to inform him of a plea offer before it expired; (2) failing to insist that the trial court answer the jury's question regarding accomplice liability correctly; and (3) failing to request a jury instruction on the lesser-included offense of assisting a criminal. [1]

## Procedural Default

Before considering the merits of a habeas petition, I need to enter the labyrinth otherwise known as procedural default. For petitioners, it's a fraught process: make one false move, and your case is a goner. The first step is ensuring that Alkhalidi has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round

---

[1] In the petition, Alkhalidi raised two other grounds for habeas relief involving the right to trial counsel of his choice and the right to effective assistance of appellate counsel. ECF 1 at 7-9. However, Alkhalidi has since conceded that these grounds are barred by procedural default. ECF 20 at 1.

of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Alkhalidi presented his claim that trial counsel was ineffective for failing to inform him of a plea offer to the Indiana Supreme Court and the Court of Appeals of Indiana at the post-conviction relief stage. ECF 12-8 at 14; ECF 12-12 at 2. Therefore, I will consider the merits of this claim. But he did not present his remaining claims to the State court and so those claims are procedurally defaulted.

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

To excuse procedural bar, Alkhalidi asserts that he had ineffective assistance of counsel during the post-conviction relief stage. As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, 565 U.S. 266, 280 (2012). However, "[i]nadequate assistance of counsel at initial-review

collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). Alkhalidi alleges, first, that his PCR lawyer provided ineffective assistance and, second, that he received ineffective assistance of trial counsel in the two procedurally defaulted claims. "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. I will assume without deciding that his post-conviction counsel was ineffective and that the two defaulted claims have some merit, and I will therefore consider the claims. *See* 28 U.S.C. § 2254(b)(2).

### Legal Standards

Before getting into the merits of the issues presented by this petition, let's first set out some basics about the standards that govern the decision making. Habeas corpus is an important error correction tool that helps to ensure the proper functioning of the criminal justice system. But the available relief is very limited. "Federal habeas review … exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted). Habeas relief can only be granted in one of two ways: if it is shown that the adjudication of the claim by the state court resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the state court decision was based "on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is a demanding standard. Indeed, it has been described by the Supreme Court as being "intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings . . . of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (quotation marks and citations omitted). What this means is that to succeed on a habeas claim the petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. *See also Harrington v. Richter*, 562 U.S. 86, 101 (2011).

That brings us to the law that applies to Alkhaildi's specific claims of ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id*. at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. However, "[o]n habeas review, [the] inquiry is now whether the state court

unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013).

"Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

## Discussion

As noted above, Alkhalidi raises three instances of ineffective assistance of counsel. The first issues involves how his attorney handled the plea offer that was made to Alkhalidi some months prior to trial. The second relates to how trial counsel handled the response to a jury question. And finally, the third claim of ineffectiveness relates to trial counsel's handling of a jury instruction issue. I will take each issue in turn below.

### A. Alleged Ineffectiveness Relating to the Plea Offer

Alkhalidi's most substantial claim is that the State court's decision that he was not prejudiced by trial counsel's failure to advise him of the plea offer was unreasonable. He argues that, in reaching this decision, the State court applied the incorrect standard and unreasonably determined that, as a matter of fact, Alkhalidi would not have accepted the plea offer even if it were assumed the offer was not presented to him. Alkhalidi also argues that the court's back up argument — that the trial court would not have accepted the plea agreement even if it were entered into by Alkhalidi — was unreasonable.

Here's how things unfolded prior to trial related to plea negotiations: During the pretrial proceedings for Alkhalidi's retrial, on September 13, 2007, the prosecution sent a letter addressed to trial counsel with a plea offer:

> The best offer I can extend to resolve this case is that Mr. Alkhalidi enters a plea of guilty to Robbery, Class A Felony and Auto Theft, Class D Felony. At sentencing, the State would dismiss the remaining counts and both parties are free to argue at sentencing.
>
> Please discuss this offer with your client and let Chris Wrage know, because I will not be in the office much longer and she will be handling this case. The deadline for this offer is September 21, 2017 at 4:00 p.m.

PCR. Ex. B.

At a pretrial hearing, on October 16, 2007, the trial court held a hearing to address Alkhalidi's motion for change of counsel, which included a discussion of the plea offer. I set it out at length below because of the importance to the issue presently before me:

> **Alkhalidi:** And most recently, basically, from the period of late August and early September, was there is a plea negotiation between my attorney. Which is the only thing I'm aware of is there is a plea investigation. On September 24, you know, I noticed that. They can't let me know, say, well, this is what they offer you. They offer you a class B, you know, a class A, you know.
>
> **Prosecution:** Judge, we probably shouldn't get into all the specific plea negotiations in front of the court, I don't think, but there were negotiations.
>
> **The Court:** No. I think that we've got to make the record here.
>
> **Prosecution:** The problem, yes, we did send a letter to Mr. Skodinksi--[2]
>
> **Alkhalidi:** Which--
>
> **Prosecution:** Excuse me. With a timeline on it, with a plea offer, and it was told to us that he had no interest in it.

---

[2] Philip R. Skodinski served as defense counsel at Alkhalidi's second trial.

**Alkhalidi:** Oh, that's correct. I have not get the letter. The letter, you know, I specifically, because if there's negotiation, if there is a period, I was supposed to be involved. I'm supposed to know the--

**The Court:** He transmitted it to you.

**Alkhalidi:** No.

**The Court:** He told you about it.

**Alkhalidi:** Yes, he told me about it.

**The Court:** Yeah.

**Alkhalidi:** But that was exactly the date. I mean, the time's already expired, and it's for the crime is not even on the [inaudible]. The crime has to be dismissed, in '99.

**The Court:** Well that doesn't really-- I mean you can plead to things that aren't currently filed. People can plead to things that are not currently filed.

**Alkhalidi:** No. The state has to file a motion to dismiss the charges, and it was dismissed by the court.

**The Court:** But they can refile that charge, and you can plead to that.

**Alkhalidi:** That's true, within the statute of limitations. I mean, because I was charged with a class D felony, and it's nine years have passed.

**The Court:** You can plead to anything that an agreement is made to plead to.

**Alkhalidi:** Yeah, but I have to be aware of. Now you're bringing it to me after the deadline has passed. I mean the invoice I got here, it says exactly. The court can read it.

**Prosecution:** And clearly, your honor, we sent a letter that Mr. Schaffer[3] had put out very early, right when he was leaving, that would indicate a

---

[3] Frank E. Schaffer served as the prosecutor on Alkhalidi's case when the plea offer was made.

deadline. He gave him extra time for a deadline. He continues to want more deadlines. I'm not giving anymore deadlines.

**Alkhalidi:** And I have not got that letter. That's what I'm asking for. I have not seen the negotiations. The only thing I know, your honor, you see the invoice. Let's say the 24th is the deadline.

**The Court:** Yes.

**Alkhalidi:** You see, from August 24, when Mr. Skodinski has come and see me.

**The Court:** You met with him on August 29.

**Alkhalidi:** I'm talking about in September, your honor.

**The Court:** You met with him-- Oh, Mr. Radde[4] met with him. I don't know if he came to see you or not on September 4.

**Alkhalidi:** No, no, your honor. That's what I'm saying. It's been on September 10 we have meeting with the prosecutor. On September 10 until the time has expired. Which is the 24th.

**The Court:** On September 10, he met with the prosecutor?

**Alkhalidi:** Yes.

**The Court:** It sounds to me like Mr. Skodinksi is doing a lot of work on this case. I don't quite-- So you're saying that you feel--

**Alkhalidi:** What I'm saying is, there is negotiation between the prosecutor and my attorney. Which is I'm, you know, I'm looking it over, but you want to have the opportunity to know what is the offer.

**The Court:** But you do know that the offer is.

**Alkhalidi:** That was after the deadline passed. You just read that. I mean you can read this and see exactly.

---

[4] Howard S. Radde served as the investigator on Alkhalidi's case and worked in tandem with Skodinksi.

**The Court:** And you you're saying that the offer was made on September 10.

**Alkhalidi:** No, no, no. The offer was made, I don't know exactly when, because I have not got it.

**The Court:** Okay.

**Alkhalidi:** And I have not been contacted until after the deadline.

**The Court:** And you're saying that you were never told about this offer until after September 21. Is that what you're saying to me.

**Alkhalidi:** Yes.

**The Court:** But you're also saying to me that you weren't going to accept the offer, is that right?

**Alkhalidi:** Because if I know that the offer is, you know--

**The Court:** Okay. You know what the offer is. You know what the offer is.

**Alkhalidi:** Exactly. And the offer, basically, it does not match what I was charged with.

**The Court:** But, Mr. Alkhalidi, he has an obligation to tell you which plea offers are made. He's told you what plea offer was made. You're saying you're not even going to accept it anyway. So I'm not exactly understanding. I'm not exactly understanding where the problem is.

**Alkhalidi:** The problem is this, is the offer is not in the charges.

**The Court:** Yeah, I know, and as I said to you, you can plead to things that you weren't charged with. This happens all the time. If you ask anybody in the jail, you will find someone who pled to something that they weren't originally charged with.

**Alkhalidi:** That's correct. I maybe misunderstand. The only reason, negotiations is supposed to be as open and counter offer. Only approach, she has one side. You can take it or leave it.

**The Court:** It can be either way.

**Alkhalidi:** Yeah. That's what I'm asking for. You know, I didn't have that opportunity.

**The Court:** Oh. You were going to make a counter offer? Well why don't you tell your attorney what the counter offer is that you want to make, and I would imagine that the state would listen to it.

**Alkhalidi:** That's, basically, that's what I'm talking about. I don't have no line of communication, because Mr. Skodinksi will come and tell me something and leave and never come back, and when I write him I don't get nothing. I've been writing him, writing him. I have not got one single letter from my attorney.

Trial Tr. Addendum 126-131. The trial court did not grant the motion for a change of counsel, and, in April 2008, the jury trial took place with Skodinski as trial counsel.

At the post-conviction relief stage, Alkhalidi testified at an evidentiary hearing about the pretrial plea offer. Here's what he said:

**PCR Counsel:** Now, what was your understanding of that offer? Would it have been a favorable offer? Something you would have considered of accepted? What are your thoughts about that?

**Alkhalidi:** Had I known about it, yes, I would have accepted it.

**PCR Counsel:** Have you know about it, you would have accepted the offer?

**Alkhalidi:** Yes.

**PCR Counsel:** Is the offer much less than a murder conviction?

**Alkhalidi:** Yes.

**PCR Counsel:** So you would have accepted it, rather than going to trial on a murder charge?

**Alkhalidi:** Yes. I mean, at the least, I will submit a counter offer. But I will accept that offer, yes.

PCR Tr. 63-64.

The St. Joseph Circuit Court denied Alkhalidi's PCR petition that claimed ineffective assistance of trial counsel. The court decided that, even if trial counsel failed to advise Alkhalidi of the plea offer, he suffered no prejudice. ECF 12-11 at 9-10. The lower court based this conclusion on findings that Alkhalidi would not have accepted the plea offer and that the trial court would not have accepted the plea due to Alkhalidi's protests of innocence. *Id.* On appeal, the Court of Appeals of Indiana noted that Alkhalidi's statements at the pretrial hearing and his testimony at the post-conviction hearing were ambiguous as to whether he would have accepted the plea offer. *Id.* at 12-13. It further noted that Alkhalidi professed his innocence before trial, during trial, at sentencing, and at the post-conviction relief stage. *Id.* at 15-16. Based on this evidence, the appellate court agreed with the lower court's findings and affirmed its decision. *Id.* at 17-18.

After reviewing the record, I cannot conclude that the State court's determination that Alkhalidi suffered no prejudice was unreasonable. It is certainly not an open-and-shut case, but the Indiana courts have fully considered the issue and even if I were to think that their decision was wrong — and I don't — that would not be enough to grant the petition. The standard is much higher than that. To the extent the state court's decision are considered factual findings, those factual determination can only be reversed by a federal court if they were downright unreasonable "in light of the evidence that was presented." *See* 28 U.S.C. § 2254(d)(2). If the argument is that the state court misapplied the prejudice prong of *Strickland*, the standard is equally stiff. Alkhalidi has to show that there is no "possib[ility] that fairminded jurists could

disagree" that the State court's decision conflicts with the prejudice prong of *Strickland*. *Harrington*, 562 U.S. at 102. Alkhalidi simply cannot meet these demanding standards.

Alkhalidi argues that the State court erred by finding that he would not have accepted the plea offer based on his references to the statute of limitations and to charges not included in the indictment. In support of this argument, he highlights the fact that he never expressly testified that he would not have accepted the plea offer and that he was reluctant to tell the trial court that he would have accepted the plea offer given the pendency of the criminal charges and the expiration of the offer. He contends that the reference to making a counteroffer did not mean that he would not have eventually accepted the plea offer. He further contends that the reference to the statute of limitations was a misunderstanding of the law rather than evidence that he would not have accepted the plea offer.

For Alkhalidi to prevail on this argument, he must rebut the State court's finding of fact by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This is a high standard to meet and while Alkhaldi's arguments do have potential merit, that standard has not been met here. While Alkhalidi's observations are certainly relevant to the factual determination, they simply do not amount to clear and convincing evidence that State court erred in determining that he would not have accepted the plea offer. At the pretrial hearing, when asked whether he would have accepted the plea offer, Alkhalidi did not say yes but instead referenced the statute of limitations and charges not included in his indictment, which suggests that he did not intend to accept the offer. When the trial court explained that these considerations did not bar a plea deal, he

complained that he did not have the opportunity to make a counteroffer. While it is possible that the State court misinterpreted Alkhalidi's responses in concluding that he would not have accepted the offer, I cannot with full confidence say that the State court's finding on this issue is unreasonable under section 2254(d)(2).

I have also considered the letter Alkhalidi wrote to the bar disciplinary committee two weeks after the pretrial hearing and a letter he wrote to the trial court six days before. Appeal App. 89-92; PCR State Ex. 1. In these letters, he complained that trial counsel had negotiated a plea deal for charges that were dismissed and could not be refiled due to the statute of limitations. These letters imply that Alkhalidi's concern at that time was that trial counsel had negotiated an unacceptable plea deal. Moreover, it is unclear whether Alkhalidi ever had a sincere interest in a plea deal; no evidence in the record suggests that Alkhalidi made any attempt to counteroffer despite the trial court's invitation and even though he had nearly six months before the trial to do so. Even seven years later at the post-conviction hearing, he was unable to unequivocally state that he would have accepted the plea offer. He hedged by saying he would have "at the least, . . . submit a counter offer." PCR Tr. at 63-64. Considering Alkhalidi's ambiguous responses at the pretrial hearing and his course of conduct thereafter, the State court's determination on this issue was not unreasonable.

Alkhalidi further argues that the State court erred by considering the protests of innocence in light of his right to remain silent, stating that there is "fine line between exercising the right to remain silent and professing innocence, especially when a defendant is put on the spot." He alludes to the trial court's questioning at the pretrial

hearing about whether he intended to accept the plea offer. However, this argument mischaracterizes the State court's decision. In considering this factor, the appellate court relied on unsolicited letters sent to the trial court before trial, his testimony under oath at trial, and his statement at sentencing. ECF 12-11 at 15-16. The record indicates that Alkhalidi voluntarily provided each of these communications; thus the State court could not have violated his right to remain silent by relying on them.

Alkhalidi also argues that the State court unreasonably determined that he maintained that he was innocent of the charges before, during and after the trial. He contends that his protestations of innocence were focused on the murder rather than the robbery and that there was no reason to believe that he would not have admitted guilt to the robbery charge. This contention may apply to the sentencing testimony, but, in most instances, Alkhalidi's protestations of innocence were ambiguous — for example, in various motions and letters, Alkhalidi generally referred to his wrongful charges and convictions without further specification. Appeal App. 35-37, 38-40, 78. More significantly, Alkhalidi expressly denied his involvement with any of the charged crimes on at least two occasions. In the letter to the bar disciplinary committee, Alkhalidi wrote that he was "wrongfully convicted of murder, felony murder, robbery, attempted robbery, and receiving stolen property." Appeal App. 89. He also denied wrongdoing with respect to any of the charges during his statements under oath at trial. Trial Tr. 1296, 1322-23, 1506-07.

Alkhalidi further argues that only the protestations of innocence before September 2007 are relevant because that was when the plea offer expired. Though I

understand the argument that statements preceding the plea offer should be afforded more weight, I cannot find that Alkahlidi's statements in the six months that followed were entirely irrelevant to whether he would have provided a factual basis sufficient for the trial court to accept his guilty plea. Alkhalidi made these statements not long after the expiration of the plea offer, and these statements were not materially different than his denials before that date. Considering the letter to the bar disciplinary committee, the trial testimony, and his multiple statements throughout the proceedings, I cannot find that the State court's determination that Alkhalidi protested his innocence before, after, and during trial was unreasonable. Nor can I find that the State court's reliance on that determination was unreasonable.

Alkhalidi argues that the State court applied the wrong standard by requiring him to show that the outcome would have been different instead of requiring him to show a reasonable probability that the outcome would have been different. He refers to the following language in the appellate court's decision:

> Given that Alkhalidi repeatedly and emphatically stated that he was innocent of the murder and robbery charges, before, and after the retrial, we find that he has not established that he would have accepted the plea offer. Additionally, we find that he has not established that the trial court would have accepted the guilty plea given Alkhalidi's many protestations of innocence.

ECF 12-11 at 18. Here, Alkhalidi misinterprets the appellate court's decision. Significantly, the Court of Appeals of Indiana began the analysis of this claim by correctly articulating the standard for ineffective assistance of counsel as set forth in the seminal *Strickland* case; the parties' appellate briefs provided this standard as well. *Id.* at

10-12; ECF 8-8 at 15-17; ECF 8-9 at 35-39. Further, a cursory search of Westlaw reveals more than one thousand instances in which this appellate court has applied the *Strickland* standard. Considering the foregoing, the most reasonable interpretation of this language was that it was simply imprecise and that a complete articulation of the *Strickland* standard was deemed unnecessary given the robust explanation at the outset.

In sum, I cannot find that the State court unreasonably applied the law or relied on an unreasonable determination of fact in denying this claim. Therefore, Alkhalidi's claim that trial counsel was ineffective for failing to inform him of the plea offer is not a basis for habeas relief.

### B.  Effectiveness in Responding to the Jury Question

Alkhalidi argues that trial counsel was ineffective for failing to ensure that the court's answers to the jury's questions regarding accomplice liability were correct. He contends that, if trial counsel had insisted on a correct answer, there is a reasonable probability that the jury's verdict would have been different. Because no State court has squarely addressed the merits of this claim, "we review the claim de novo under the pre-AEDPA standard of 28 U.S.C. § 2243, but still with deference to the state court." *Ruhl v. Hardy*, 743 F.3d 1083, 1091 (7th Cir. 2014).

At trial, Alkhalidi faced charges of murder (a class A felony), felony murder (a class A felony), receiving stolen property in the form of a license plate (a class D felony), and robbery (a class A felony). Appeal App. 23-25; 106-07; 108-112. The evidence against Alkhalidi was strong. Here's what it showed: Alkhalidi was with the victim on the night of his murder on either the night of May 3 or the morning of May 4, 1999; that

the victim had three thousand dollars in cash as of May 2; and that, on May 4, 1999, Alkhalidi bought in at the casino for substantially more money than his usual buy-in. Trial Tr. 351-61, 445, 955-58. The state proved that the victim died of a gunshot wound caused by a .44 or .45 caliber bullet, and his vehicle was found with a missing license plate. *Id.* at 289-90 506-08. On May 13, detectives approached Alkhalidi in his driveway, saw the victim's license plate in the trunk of Alkhalidi's car, and asked Alkhalidi for identification. *Id.* at 531-34. In response, Alkhalidi acted nervously, shoved a detective to the ground, and ran away. *Id.* After obtaining a search warrant for Alkhalidi's car and residence, the police found the victim's driver license and cell phone, ammonia, wash cloths, towels, a trunk liner in the trash, .45 caliber cartridges, including one spent cartridge, a cartridge holder, a matchbook from the Blue Chip Casino, and an item with the victim's name on it. *Id.* at 727-46. Several items with blood were also found, and lab tests revealed that the blood belonged to the victim, and Alkhalidi's fingerprints were found on the cartridge holder. *Id.* at 760-62, 1087-94. In short, there was a mountain of evidence against him.

Alkhalidi took the stand at trial and testified that someone else — a friend of his — unexpectedly shot the victim as he and the friend were driving on the freeway in separate vehicles. *Id.* at 1290-91. He testified that he helped his friend remove the victim's body from the passenger seat to the trunk and later abandoned it in the woods. *Id.* at 1294-97. He stated that the police tricked him into touching the cartridge holder with his hands. *Id.* at 1325-26. He denied any involvement in the killing of the victim, denied purposefully taking any money or items from the victim, and denied any

knowledge of how the license plate ended up in the trunk of his vehicle. *Id.* at 1296, 1322-23.

At the jury instruction conference, trial counsel submitted a jury instruction, which stated:

> The Court further instructs you that a person who with the intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists the person subsequent to the commission of the offense is not criminally responsible for that offense.

*Id.* at 1414. Trial counsel argued that this instruction was needed because Alkhalidi's testified that he assisted his friend with crimes after the fact instead of acting as an accomplice or aiding and abetting the commission of the crime. *Id.* at 1415. The trial court partially agreed with trial counsel but found that such an instruction should focus on the limits of accomplice liability instead of the uncharged crime of assisting a criminal. *Id.* at 1415-19. It also expressed a preference for language that had been approved by the appellate courts. *Id.* The trial court proposed the following language from *Turner v. State*, 755 N.E.2d 194 (Ind. App. Ct. 2001):

> Factors considered by the fact-finder to determine whether a defendant aided another in the commission of a crime include: (1) presence at the scene of the crime, (2) companionship with another engaged in a crime, (3) failure to oppose the commission of the crime, and (4) the course of conduct before, during, and after the crime occurred. While the defendant's presence during the commission of the crime or his failure to oppose the crime are, by themselves, insufficient to establish accomplice liability, the jury may consider them along with other facts and circumstances tending to show participation. In order to sustain a conviction as an accomplice, there must be evidence of the defendant's affirmative conduct, either in the form of acts or words, from which an inference of common design or purpose to affect the commission of a crime may be reasonably drawn.

After some consideration, trial counsel withdrew his request to add an instruction. *Id.* at

1422. In closing, trial counsel argued that the evidence indicated that Alkhalidi

attempted to conceal the killing after it happened but that it did not support that he

planned to rob the victim or participated in the killing itself. *Id.* at 1607-16.

      During deliberations, the jury asked two questions:

      Is aiding the same as being an accessory to the crime? What does an
      accessory after the fact mean? Lawyers' terms?

* * *

      At what point is a crime over? In other words, in aiding and abetting, does
      that have to happen during the course of or after the crime? Helping to
      hide the body may have happened after the actual murder, but is that
      aiding during the crime or after the crime? Laymen's terms please. Can
      you define knowingly as well?

*Id.* at 1644.

      In formulating a response to these questions, the trial court and trial counsel

again debated about whether the response to the jury should focus on defining

accomplice liability or explaining the crime of assisting a criminal after the fact. *Id.* at

1645-53. The trial court was reluctant to give an instruction regarding an uncharged

crime and again suggested the *Turner* language. *Id.* Trial counsel argued that the *Turner*

language did not answer the question of when a crime was over and suggested

referring the jury to the murder instruction. *Id.* He also objected to the language's

mention of conduct after the crime. *Id.* However, the trial court directed trial counsel to

the final sentence of the language, which explained that the ultimate inquiry was

whether the evidence demonstrated that a common design or purpose to affect the

commission of a crime, and trial counsel accepted the language. *Id.* at 1653. After

thirteen hours of deliberation, the jury convicted him on all counts. *Id.* at 1677.

Alkhalidi argues that the jury's question was about the significance of his efforts

in concealing the victim's body and that trial counsel should have insisted that the court

answer as follows:

> Helping another person to hide the body of someone he murdered is not
> itself aiding that person to commit murder, although it can of course be
> circumstantial evidence, along with other facts and circumstances tending
> to support the conclusion that the helper did in fact aid, induce or cause
> the other person to commit murder.

ECF 3 at 11. Though Alkhalidi's proposed answer addresses one of the jury's questions

more directly, the trial court's answer adequately communicated the same idea by

highlighting the ultimate inquiry and indicating that events after the murder were

relevant to that inquiry. The jury also received an instruction on accomplice liability,

which read, "A person who knowingly or intentionally aids, induces, or causes another

person to commit an offense." Appeal App. 142. This instruction informed the jury that,

for a conviction based on accomplice liability, they were required to find that Alkhalidi

took some act to cause the murder. Logically, such an act must have occurred before or

during the commission of the murder, and thus a reasonable jury with these

instructions would not have convicted Alkhalidi of murder if they believed that he

participated only in the attempt to conceal the crime.

Further, the jury deliberated for about eight hours after the questions were

answered but did not ask any more questions on the same issue. Trial Tr. 1644-77. And

there was no guarantee that the trial court would have allowed a more specific answer

even if trial counsel had argued more strenuously, given its preference for language that had been approved by the appellate courts and its insistence on using the *Turner* language to clarify the accomplice liability issue. As a result, I do not find a reasonable likelihood that the outcome would have been different if trial counsel would have argued more strenuously for a more specific answer.

Nor can I find that trial counsel's performance was deficient. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. Here, trial counsel considered the *Turner* language first at the jury instruction conference and later during deliberations. Only after reviewing the *Turner* language, proposing alternative instructions, and discussing the issue with the trial court on two separate occasions did he acquiesce to the trial court's proposed instruction. In short, the trial transcript demonstrates that the decision to allow the use of the *Turner* language was a strategic decision. Therefore, Alkhalidi's claims that trial counsel was ineffective for failing to ensure that the court's answer to the jury's questions regarding accomplice liability were correct is not a basis for habeas relief.

## C.  Lesser Included Offense

Alkhalidi argues that his trial counsel was ineffective for failing to request a jury instruction that would have allowed the jury to convict him of the offense of assisting a

criminal, a class C felony under Indiana law. He contends that there was a reasonable probability that the outcome would have been different because the jury may have convicted him of assisting a criminal instead of murder and felony murder if given the choice.

In support of his argument, Alkhalidi relies on *U.S. ex rel. Barnard v. Lane*, 819 F.2d 798 (7th Cir. 1987). In that case, the petitioner argued that trial counsel was ineffective for failing to request a jury instruction for manslaughter. *Id.* at 802. At trial, the petitioner was charged with three counts of murder and three counts of armed violence,[5] and trial counsel declined to request a manslaughter instruction and a self-defense instruction based on go for broke strategy. *Id.* at 803. The Seventh Circuit found that this strategy constituted deficient performance because the evidence presented at trial, including the defense case, left the jury with a choice between convicting the petitioner or ignoring the instructions. *Id.* at 803-04. The court noted the jury's questions, which suggested that they were seeking to convict on a charge other than murder:

- Can we find [the petitioner] guilty of armed violence without finding him guilty of murder?

- There are three different definitions of murder. Also, three different definitions or armed violence. Do we have to find him guilty or not guilty of any one of these definitions or all three definitions?

---

[5] While the opinion does not describe these charges with particularity, it appears that the three counts of murder were based on different theories but were equivalent for sentencing purposes and that the counts of armed violence operated as sentence enhancements requiring an underlying conviction.

- Is there any way to find him guilty of a lesser charge other than murder or armed violence?

- Can we find [the petitioner] guilty of one count of murder and not guilty of armed violence?

- We want to know if we can charge [the petitioner] with one count of murder and can we specific which count that is or by signing the guilty form, would we be charging him with all three counts automatically?

- If we find [the petitioner] guilty of this one charge, will it be read and agreed this to be the only charge?

*Id.* at 804. Ten hours and one deadlock instruction later, the jury found the petitioner guilty of one count of murder. *Id.* Based on the jury's conduct, the Seventh Circuit found prejudice and that the failure to request a manslaughter instruction constituted ineffective assistance. *Id.* at 804-05.

Alkhalidi's case is distinguishable from *Barnard* in numerous respects. To start, the tone of the jury questions and the need for a deadlock instruction suggests that the *Barnard* jury was far more conflicted about their verdict than the jury in Alkhalidi's case. Even more significantly, here, the jury was not faced with an all-or-nothing proposition based on the charges and the evidence at trial. Rather, trial counsel presented evidence that would have allowed the jury to acquit him on all charges while adhering to the jury instructions; it also would have allowed the jury to convict only on the charges robbery or receipt of stolen property. Moreover, trial counsel's statements during closing argument show that the defense strategy was substantially similar to the strategy suggested by Alkhalidi:

So [Sahap Alshamiri's][6] involved, but the state doesn't want you to know he's involved. He's not even a part of their case in chief, but Mr. Alkhalidi tells you he's involved. Their own evidence and the boat's evidence tells you he's involved. He's got the money. Don't forget about that. Who has the money the next day" Alshamiri's got the money the next day.

Mr. Alkhalidi witnessed the crime. He didn't know the crime was going to occur. He was involved in the committing of the crime. He may have done some things after the crime, but he didn't do anything before, and he didn't commit the crime, and there isn't any evidence to say he committed the crime. Even if you accept the fact that the license plate is in the car, so what? I mean maybe, and according to Mr. Alkhalidi, that would have been put in the trunk by Alshamiri.

But even if it wasn't, even if he knows the license plate is in the car, he's guilty of receiving stolen property. The license plate. Even if you don't believe him that he didn't see the license plate in the car, he didn't know it was there, assume he knew it was there. It doesn't mean he killed anybody. You could find him guilty of receiving stolen property. That he knew it was there. Go ahead. It doesn't show that he was guilty of murder.

Trial Tr. 1615-16.

Because trial counsel's decision to invite the jury to convict on the receipt of

stolen property charge alone was a strategic decision, I cannot find that he acted

deficiently by failing to request an instruction for the offense of assisting a criminal.

Similarly, because trial counsel's strategy substantially resembles the strategy proposed

by Alkhalidi, I cannot find that Alkhalidi was prejudiced by this strategy. Therefore,

Alkhalidi's claim that trial counsel was ineffective for failing to request a jury

instruction on the offense of assisting a criminal is not a basis for habeas relief.

---

[6] According to Alkhalidi's testimony, this was his friend who actually killed the victim, Claude Purdiman.

<u>Evidentiary Hearing</u>

In the petition, Alkhalidi requested an evidentiary hearing to show that his that his post-conviction counsel was ineffective. ECF 1 at 10. However, I presumed ineffectiveness rather than setting an evidentiary hearing, and neither party has requested an evidentiary hearing for any other purpose. Nevertheless, despite the absence of a request, I also considered the utility of setting an evidentiary hearing on merits of the procedurally defaulted claims. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). None of Alkhalidi's arguments suggest that he needs testimony from anyone to prove his claims; instead his arguments relied solely on the State court record. Because the ineffectiveness of post-conviction counsel is moot and because I see no other reason for additional evidence, I deny the request for an evidentiary hearing.

<u>Certificate of Appealability</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because I find that the effectiveness of his counsel as

it relates to the handling of plea negotiations presents a close enough issue, I will grant

a certificate of appealability on that issue. But for the reasons explained in this opinion, I

will deny a certificate of appealability on the other two issues.

For these reasons, the court:

(1) DENIES the habeas corpus petition (ECF 1);

(2) GRANTS a certificate of appealability on issue number one described above,

but DENIES a certificate of appealability on issues two and three pursuant to Section

2254 Habeas Corpus Rule 11; and

(3) DIRECTS the clerk to enter judgment in favor of the Respondent and against

the Petitioner.

SO ORDERED on February 1, 2019.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT